VOLUME I
PAGES 1 - 213
EXHIBITS 31-43

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 04-CV-11413-EFH
(and consolidated cases)

FREDERICK BABCOCK, ET AL
vs.
UNITED STATES OF AMERICA, ET AL

DEPOSITION OF JAMES J. NICKERSON, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure on behalf of the Defendant, Split Boulder Construction, Inc., before Dawn M. Cunningham, CSR, RPR, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Nelson, Kinder, Mosseau & Saturley, PC, 45 Milk Street, Boston, Massachusetts, on Monday, March 13, 2006, commencing at 10:17 a.m., pursuant to Notice and agreement of parties as to the date and time of taking said deposition.

* * * * *

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

---

APPEARANCES:

Esdaile, Barrett & Esdaile
75 Federal Street
Boston, Massachusetts  02110-1904
(By Michael E. Mone, Jr., Esquire)
Representing the Plaintiffs.

U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, DC  20044-4271
(By Stephen M. Ketyer, Esquire)
Representing the Defendant, United States of America.

Nelson, Kinder, Mosseau & Saturley, PC
45 Milk Street
Boston, Massachusetts  02109
(By Gerald F. Lucey, Esquire)
Representing the Defendant, Northeastern University.

Casner & Edwards, LLP
303 Congress Street
Boston, Massachusetts  02210
(By Christopher Maffucci, Esquire)
Representing the Defendant, Ledgewood Construction Company, Inc.

Masi & Bruno
124 Long Pond Road, Unit 11
Plymouth, Massachusetts  02360
(By John H. Bruno, II, Esquire)
Representing the Defendant, Split Boulder Construction, Inc.

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

---

APPEARANCES CONTINUED:

Joslin Murphy, Esquire
Office of Town Counsel
Town of Brookline
333 Washington Street
Brookline, Massachusetts  02445
Representing the Plaintiff, Town of Brookline and the Deponent.

Donovan Hatem, LLP
World Trade Center East
Two Seaport Lane
(By Brian Newberry, Esquire)
Representing the Defendant, PEDA, Inc.

Also Present:  Brian Burns, Esquire
               Northeastern University

* * * * *

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

---

INDEX

DEPOSITION OF:
JAMES J. NICKERSON

|  | Page |
|---|---|
| Direct Examination by Mr. Bruno | 6 |
| Direct Examination by Mr. Maffucci | 98 |
| Direct Examination by Mr. Mone | 152 |
| Direct Examination by Mr. Ketyer | 156 |
| Direct Examination by Mr. Lucey | 166 |

* * * * *

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

73

    Let me just move this to the side for a moment.
A  It would be a -- what we -- let me find it. This would be a final affidavit.
Q  Do you have that document?
A  I do.
Q  Okay. Thank you.
    MR. BRUNO: Let's have this marked. Now, this is an original document since I can see the seal on it.
A  Uh-huh.
    MR. BRUNO: Let me just have that marked as the next exhibit which is --
    MR. KETYER: 38 I think.
    MR. BRUNO: -- 38.
    (Exhibit No. 38, Final Affidavit, so marked.)
Q  Okay. Can you identify for us what -- Exhibit 38, what it is?
A  It's a final affidavit where the engineer or the architect goes out and tells us that it has been built according to the state building code and he signs it and this is signed by the engineer.

74

Q  What's the date on Exhibit 38?
A  The date on this here is September 18, 2001.
Q  Okay. And the person whose affidavit --
A  This was signed by John D. Hollywood, civil engineer.
Q  Do you know who Mr. Hollywood represents or works for?
A  He works for the -- no, I don't know whether he's working for the -- I believe he's working for the contractor. It says here that he inspected the construction of Northeast University Parsons Field at 186 Kent Street and he signed it.
Q  Okay. Now, does the Town of Brookline Building Department also do an inspection -- or a final inspection of any sort?
A  Yes. We go out and do a final but we usually have an engineer sign-off on everything because he's supposed to be there when things are happening and overseeing the job because under the building code when you have a -- that large of a project, it comes under controlled construction, and it's up to the engineer to oversee it.

75

Q  It needs an engineer?
A  Yes.
Q  And the engineer in this case was Mr. Hollywood?
A  Yes.
Q  But Mr. Hollywood didn't work for Brookline, he worked for a contractor?
A  That's true.
Q  Okay. That's the usual way of handling that?
A  That's the way it is handled according to the building code.
Q  Is there any other separate report issued by the Town of Brookline building inspector, in this case Mr. Brown, indicating that he has gone and looked at the renovation project?
A  Only in his -- in his daily log that he keeps.
Q  Okay. So we -- as we sit here today, we have no way of knowing whether Mr. Brown actually went and looked at the project or inspected anything whenever it was concluded in 2001?
A  We have no evidence, no.
Q  Okay. I also noted that on Exhibit 38 it references permit number 0100515 which is

76

  Exhibit No. 36 which was the -- let's see here -- first of the two permits that were issued by Brookline.
    Is there an inspection report or affidavit, relating to Exhibit No. 34B, which is permit number 0100524?
A  There is an affidavit here but it doesn't -- it doesn't say what permit. It just says the site work at Northeastern Parsons Field.
Q  Okay.
    MR. BRUNO: Let me have that marked. Again, that's an original document and this will be 39.
    (Exhibit No. 39, Affidavit, so marked.)
Q  Exhibit 39, Mr. Nickerson, it indicates at the top here construction control?
A  Uh-huh.
Q  And it has as a date May 8, 2001 which would be the time when the building permits were -- the applications were first submitted.
A  Uh-huh.
Q  So is this a different document than Exhibit 38?

85

made an inspection or would he have required an engineering drawing of some sort?

A   That would have come under the controlled construction and the engineer would have overseen -- the engineer is responsible for overseeing everything under controlled construction and that's what that site was.

Q   Okay. Would it go down to the detail of what sort of fasteners were used to hold the dugout to its foundation in its new location, the engineer's responsibility?

A   Yes. The engineer signs that it was built according to the building code.

MR. LUCEY: I'm sorry, I didn't hear the last part.

A   The engineer would sign his affidavit saying that under -- that the building -- or the work done at the site was done according to the building code.

MR. LUCEY: Thank you.

A   To the best of his knowledge.

Q   Going back to the building code that we asked you to look at here, you referenced Section 3606.2.3A as the fasteners schedule?

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

86

A   Uh-huh.
Q   And looking at the building code, that's a table?
A   Uh-huh.
Q   And in this table does it indicate where -- can you tell me where it indicates the foundation attachments?
A   Let me just check something here.
    I'd have to look it up to find the exact area where it talks about the number of bolts and --
Q   Is it not in that table that you referenced earlier, the --
A   No, it's not in that table.
Q   What section do you think it may be in?
A   Foundation -- foundation walls and I'm looking for the sill plate, where it talks about the sill plate.
    MR. BRUNO: S-I-L-L.
A   I have no idea which section it's in right now. I'd have to spend some time to look for it.
Q   Okay. We can come back to that.
    I did note that in 3606.2.3.1 where

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

87

you indicated special provisions, high wind noting, that the building code actually referenced a map that said -- for high wind loading. Where is that map?

A   There's a whole section on wind and foundations and everything so I'd have to find all that for you.

Q   Is that something you might have to study a little bit on the book there to come up with an answer?

A   Yeah. I don't even -- yes. Yeah, something like that. You know, I don't go into this thing on a daily basis.

Q   Okay. In the permit applications that we've discussed such as Exhibit No. 37, it references -- no, not 37. 34B, on the back of the permit it references total cost of the job and then the permit fee.
    And -- for example, on the permit that was 34B with its application, which is 35, it references $638,500. This is for Phase II. And for permit number -- for Exhibit No. 36, which is the earlier permit, the application on this one indicates at

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

88

first $500,000 with a permit fee of 10,000 and then next to it is a number, $1,138,500.
    Do you know what that one extra number is?

A   No idea. No idea.
Q   Was this project considered a large project for the Brookline Building Department?
A   Yes.
Q   And --
A   It was all -- yes, it was.
Q   And would it also have been a sensitive project because of the history with the neighbors around the Parsons Field?
A   Yes.
Q   Something that the building department would want to pay attention to to make sure it went right?
A   We wanted to make sure that they stayed within the footprint and didn't expand or do away with any of the open grass or create more parking or eliminate more parking.
Q   Okay. Let me skip ahead now to the -- this incident that happens in January of 2002 with the helicopters.

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

161

    And if not, why don't you just read through it.
    Have you had an opportunity to -- first of all, have you seen this before?

A   No.

Q   Okay. On page 2 there is a paragraph and it's the second paragraph on the page --

    MR. KETYER: For the record this is a supplemental report signed by a Detective Barry S. Neilly of the Brookline Police Department dated -- well, it refers to January 5, 2002.

    MS. MURPHY: That's McNeilly.

    MR. KETYER: I'm sorry, McNeilly.

Q   You'll see it says it should be noted. Do you see that paragraph?

A   Uh-huh.

Q   Now, when the dugout was in its original location, there were three columns, four by fours, affixed to the top along the joist system.
    Should those three columns have been anchored or attached to anything at the bottom?

162

A   I would say yes but that would be up to an engineer to determine just how they should be secured.

Q   Why would you say yes?

    MR. LUCEY: Objection.

A   Because the columns just sitting there by themselves could be knocked out of place by somebody just hitting them. So that's the reason I would say that they should be anchored but -- for safety reasons but the building itself, if the engineer had secured it to his specifications it wasn't going to go anywhere.

Q   So is it fair to say that you're thinking that the -- the fact that the columns may not have been attached to the foundation, would that have been a violation of the code?

A   The columns?

    MR. LUCEY: Objection.

    MR. NEWBERRY: Objection.

A   No.

Q   Because?

A   Well, again, I would have to see what -- the engineer's method of securing that to the

163

foundation and, you know, if the columns were -- were secured -- not bolted but secured so that they couldn't be drifted away. I think the columns were -- were just holding up the front edge of it. They weren't holding up -- they weren't meant to keep the unit down or to secure it in place in any way.

Q   Do you know what, if anything, would keep the dugout from being blown away?

A   Just -- no, I don't.

Q   Would that have been a -- one of the things that your inspectors would have inspected for?

    MR. BRUNO: Would what have been?

A   No.

    MR. BRUNO: I didn't understand the question. Would what have been one of the things they would have inspected for?

    MR. KETYER: That the structure was anchored.

A   Oh, that it was anchored down properly? Well, we would have relied on the engineer to tell us that it was built according to the

164

code but when we went out there, we would have looked, yes.

Q   And as you've testified, there was no such engineering information?

A   I -- we didn't have any.

Q   When you talk about hurricane wind conditions, is that something that you could describe in terms of wind speed and duration?

A   No. That would be up to an engineer to -- to look at the situation and tell us if it was required for that area.

Q   So you would have to rely on the formulas in the state building code?

A   Yes. And working with the Town -- with the engineer on-site that would be designing this.

Q   In general when a roof is supported by posts, is there any requirement whether or not those posts should be attached to the foundation at the bottom?

A   Yes. Yeah. They -- normal construction we see them all attached.

Q   Have you ever seen in construction where they're not attached?

165

A  Yes.
Q  And where have you seen those?
A  I can't tell you where. I mean, I don't recall, but I have seen some that were -- they weren't a very large structure that was -- that wasn't supporting a whole lot but they were secured by methods of the building itself. They weren't just standing out there free.
    MR. KETYER: I believe that's all I have. Thank you.
    MR. LUCEY: Let's take a two-minute break or a four-minute break.
    (Recess taken.)
    MR. KETYER: I have one more question.
Q  (By Mr. Ketyer) Referring to Exhibit 26 --
A  Yes.
Q  -- was there anything within this exhibit that you saw that you thought might have -- might describe a violation of the building code?
A  Yes.
Q  And what was that?

166

A  The cutting off of the -- of the studs that were to hold the plate on.
Q  How is that a violation of the building code?
A  Well, it's -- the plate is supposed to be secured to the foundation, and those bolts were put in there purposely to secure that to the foundation.
Q  Wouldn't wedge anchors have been a suitable alternative?
A  That, again, would be up to the engineer. If he said so, then we wouldn't have a problem with them. But to see them just cut off and discarded we definitely would have asked for an engineer to give us a report.
Q  And when you say a report, what would you expect to --
A  To tell us that the method of anchoring it to the concrete was suitable.
    MR. KETYER: Thank you. No more.

DIRECT EXAMINATION

Q  (By Mr. Lucey) Good afternoon, Mr. Nickerson. My name is Gerald F. Lucey. I represent Northeastern University.

167

    And based on my understanding of your testimony here today, there are no documents that are within the possession, custody, or control of the Town of Brookline, at least to your knowledge, which indicate to the Town of Brookline that the dugouts at Parsons Field were to be relocated as part of this 2001 renovation project; is that correct?
A  Yes.
Q  Okay. Assuming that to be the fact, would it have been within the building inspector, Gerald -- last --
A  Brown.
Q  -- Brown's authority to make a field decision to approve the relocation of the dugouts as part of the work?
A  He -- he could have but he would have also asked for an additional permit to do that -- to cover that.
Q  And are you sure of that?
A  I'm not 100 percent sure but that's the -- the procedure that we should -- he should have followed.
Q  Okay. But is it fair to say that procedures

168

that one individual employee of the building department perhaps should have followed don't always get followed?
A  I can't answer that.
Q  Well, the logs should have been maintained, correct?
A  Uh-huh.
Q  And we can't find those, correct?
A  Right. But the log was maintained but we just can't find it right now.
Q  And what is your basis for saying that the log was maintained?
A  Because I seen him -- I've seen his logs. I've seen his paperwork filled out on his desk, and I've seen his -- where he puts them. So I did see them.
Q  Where did he customarily put them?
A  He put them in the drawer in his desk and then he would transfer them from there to the safe, put them in the safe.
Q  Is this a safe where other building inspectors kept their logs?
A  Yes.
Q  And who had the combination to that safe?

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659

213

GOUDREAU & GROSSI
Court Reporting Service
63 Winthrop Street
Taunton, Massachusetts 02780
508-823-4659

March 29, 2006

Joslin Murphy, Esquire
Office of Town Counsel
Town of Brookline
333 Washington Street
Brookline, MA 02445

Re: Babcock, et al vs. USA, et al

Dear Attorney Murphy:

Enclosed please find a copy of the deposition of your client, James Nickerson, taken on March 13, 2006 regarding above-captioned matter. Please arrange to have Mr. Nickerson read the transcript and sign the signature page.

Any changes or corrections may be indicated on the errata sheet and returned along with the original signature page to this office. Copies of the same should be forwarded to all counsel of record, as well as to this office. Thank you for your anticipated cooperation.

Sincerely,

Dawn M. Cunningham

DMC/dmc
Enclosure
cc: Michael E. Mone, Jr., Esquire
    Stephen M. Retyer, Esquire
    Gerald F. Lucey, Esquire
    Christopher Maffucci, Esquire
    John H. Bruno, II, Esquire
    Brian Newberry, Esquire

GOUDREAU & GROSSI COURT REPORTING
(508) 823-4659