# ATTACHMENT C

```
                                    VOL. I

                                    PAGES 1-212

                                    EXHIBITS 1-13

            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

                                    No. 04CV-11413-EFH


    FREDERICK BABCOCK, et al,  )
              Plaintiffs,      )
                               )
                  vs           )
                               )
    UNITED STATES OF AMERICA,  )
    et al,                     )
              Defendants.      )




              DEPOSITION of JOHN MALONE, taken
    on behalf of the plaintiffs, pursuant to the
    applicable provisions of the Federal Rules of
    Civil Procedure, before Katherine Henry-Sexton,
    a Notary Public in and for the Commonwealth of
    Massachusetts, at the offices of Esdaile,
    Barrett and Esdaile, 75 Federal Street, Boston,
    Massachusetts, on Friday, February 17, 2006,
    commencing at 10:10 a.m.
```

APPEARANCES:

        Esdaile, Barrett and Esdaile, (by Kathryn E. Hand, Atty.), 75 Federal Street, Boston, Massachusetts 02110-1904, for the plaintiffs.

        Nelson, Kinder, Mosseau and Saturley, PC, (by Gerald F. Lucey, Esq.), 45 Milk Street, Fifth Floor, Boston, Massachusetts 02109, for the defendant, Northeastern University and deponent.

        United States Department of Justice, (by Matthew A. Connelly, Esq.), Torts Branch, Civil Division, P.O. Box 14271, Washington, DC 20044-4271.

        Masi and Bruno, (by John H. Bruno, Esq.), 124 Long Pond Road, Unit 11, Plymouth, Massachusetts 02360, for the defendant, Split Boulder Construction.

        Casner and Edwards, LLP, (by Christopher P. Maffucci, Esq.), 303 Congress Street, Boston, Massachusetts 02210, for the defendant, Ledgewood Construction.

        Donovan Hatem, LLP, (by Brian C. Newberry, Esq.), Two Seaport Lane, Boston, Massachusetts 02210, for the defendant, PEDA, Inc.

Also Present:  Brian Burns, Esq.
               Northeastern University

I N D E X

Deposition of:                            Page

JOHN MALONE

    Examination by Ms. Hand       4
    Examination by Mr. Bruno     135
    Examination by Mr. Maffucci  164

```
 1        I N D E X  (Continued)

 2        Plaintiff
          Exhibits                                          Page
 3
          No. 1     Web site printout.                        35
 4
          No. 2     E-mail, 2/6/01.                           53
 5
          No. 3     Memo, 3/27/01.                            53
 6
          No. 4     Contract, Southwest.                      65
 7
          No. 5     Letter, 4/30/01.                          69
 8
          No. 6     Letter, 5/11/01.                          69
 9
          No. 7     Letter, 4/9/01.                           70
10
          No. 8-
11            12    Five photographs.                        134

12
          SB
13        No. 13    Daily report, 5/14/01.                  161

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              JOHN MALONE, a witness called on
 2   behalf of the plaintiffs, first having been
 3   satisfactorily identified and duly sworn by the
 4   Notary Public, on oath deposes and says as
 5   follows:
 6
 7   Examination by Ms. Hand:
 8        Q.   Mr. Malone, I introduced myself
 9   before.  My name is Kathryn Hand, and I
10   represent the plaintiffs in this lawsuit.  I'll
11   ask you some questions here today.  Have you had
12   your deposition taken before?
13        A.   No, I have not.
14        Q.   Let me give you a few ground rules.
15   This is a question and answer format.  I'll ask
16   you some questions and ask you to give me your
17   answers; and in doing so, I'd ask that you make
18   sure that you understand the question I'm asking
19   you.  If you don't, please let me know, and I'll
20   be happy to clarify the question.
21             In answering the questions, it's
22   easier for the reporter if you would let me
23   finish asking my question before you begin
24   giving your answer, and I will try not to step
```

```
1        A.    The construction manager.
2        Q.    PEDA?
3        A.    Yes.
4        Q.    Who was responsible for overall job
5   site safety?
6        A.    PEDA.
7        Q.    And who was responsible for ensuring
8   that the work was done safely and according to
9   industry standards and code?
10       A.    PEDA was.
11       Q.    On the proposal from Ledgewood
12  Construction, which is Exhibit 5, there are two
13  sections of work entitled, Subsection A, "work
14  within the turf perimeter curb including
15  dugouts, back stop netting and posts removed and
16  reset and broken down as follows". And it
17  provides a list. "B, all work outside turf
18  perimeter curb broken down as follows", and
19  another list. Looking at Exhibit 5, can you
20  tell me whether all of this work or only part of
21  it was what Northeastern agreed with Ledgewood
22  that Ledgewood would do?
23             MR. LUCEY:  Could I have the
24  question back.
```

```
 1                (Question read.)
 2        A.   This describes the majority of the
 3   work that we agreed with Ledgewood on those
 4   issues.
 5             MR. CONNELLY:  I didn't hear the
 6   witness' answer.
 7                (Answer read.)
 8        Q.   And included in the work that
 9   Ledgewood agreed to do, there's a section on the
10   first page under Subsection A that says "dugouts
11   w/existing roof systems", which I take it means
12   "dugouts with"?
13        A.   Agree.
14        Q.   Do you know what Ledgewood was
15   expecting Ledgewood to do with regard to the
16   dugouts with regard to this project?
17        A.   Yes.
18        Q.   What was that?
19        A.   They were asking them to relocate the
20   dugouts.
21        Q.   With regard to the Parsons Field
22   project was there a period of time when it was
23   unclear whether the dugouts would be destroyed
24   and replaced or salvaged and re-used?
```

```
 1        A.    There was a period.
 2        Q.    What was the decision as to whether to
 3   get rid of the existing dugouts and replace them
 4   or keep them and relocate them based on --
 5        A.    Similar to what happened with some of
 6   the other items, we'd recycle if they were in
 7   good shape.  They would - the contractor would
 8   re-use them.
 9        Q.    Why were the dugouts moved in the
10   first place?
11        A.    The dugouts were moved because the
12   layout of the fields were different.
13        Q.    There was no underlying structural or
14   age related problem with the dugouts that
15   required them to be moved?
16        A.    No.
17        Q.    Am I right the construction on the
18   Parsons Field project began in mid-May of 2001?
19        A.    Yes.
20        Q.    How did the construction begin?
21        A.    Could you --
22        Q.    What was the first phase of the
23   construction?
24        A.    First phase of the construction was to
```

```
 1        A.    We saw a letter of intent.  The
 2   exhibit number is Exhibit 6.
 3        Q.    Was there ever a written contract
 4   between the two parties?
 5        A.    No, not that I'm aware of.
 6        Q.    Now, Ledgewood's proposal, which is
 7   Exhibit 5, references dugouts down towards the
 8   bottom of subpart A?
 9        A.    Dugouts with existing roof systems.
10        Q.    What did they mean by existing roof
11   systems?  What did that phrase mean?
12        A.    It meant that those were the existing
13   dugouts that were going to be moved and
14   relocated.  And that if, you know, it was not
15   successful, that line item, $17,000, did not
16   reveal that the new dugouts could be rebuilt for
17   that, is what I believe that line item meant.
18        Q.    What do you mean if it wasn't
19   successful?
20        A.    There are some line items in this that
21   was priced based on a drawing from Sasaki.  A
22   similar line item could be the amount of fill
23   that was removed.  There was more fill removed
24   from the site than was expected, and Mr. Trainor
```

```
 1        A.    That's correct.
 2        Q.    Do you know why he left Northeastern?
 3        A.    I do not.  It's his by choice, by his
 4   decision.  Gave him a big party.
 5              MR. MAFFUCCI:  That's all I have.
 6              (Discussion of the record.)
 7              (Exhibit No. 13A, field diagram,
 8              marked.)
 9        Q.    (By Mr. Maffucci)  I'll show you
10   Exhibit 13A, and tell us where you placed the
11   location of the tables to the best of your
12   ability and how you identified it?
13        A.    I placed the location of the tables
14   and chairs along the third base line, near third
15   base along the foul line.
16        Q.    And you marked it --
17        A.    With a T.
18
19   Re-examination by Ms. Hand:
20        Q.    Mr. Malone, my name is Kathryn Hand.
21   I represent four fire fighters who are
22   plaintiffs in this action.  I just wanted to
23   follow up a little bit on a couple of questions
24   that came up today.  Do you know one way or the
```