# EXHIBIT A

## Page 1

```
         VOL. I
      PAGES 1-157
      EXHIBITS 56

    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS

         No. 04CV-11413-EFH


FREDERICK BABCOCK, et al, )
        Plaintiffs,       )
                          )
         vs               )
                          )
UNITED STATES OF AMERICA, )
et al,                    )
        Defendants.       )
```

DEPOSITION of SPLIT BOULDER CONSTRUCTION, by its designee, PAUL SCOTT DONAHUE, taken on behalf of the plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Katherine Henry-Sexton, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Esdaile, Barrett and Esdaile, 75 Federal Street, Boston, Massachusetts, on Thursday, May 25, 2006, commencing at 10:05 a.m.

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 2

APPEARANCES:

Esdaile, Barrett and Esdaile, (by Kathryn E. Hand, Atty.), 75 Federal Street, Boston, Massachusetts 02110-1904, for the plaintiffs.

Masi and Bruno, (by John H. Bruno, Esq.), 124 Long Pond Road, Unit 11, Plymouth, Massachusetts 02360, for the defendant, Split Boulder Construction.

Donovan Hatem, LLP, (by Brian C. Newberry, Esq.), Two Seaport Lane, Boston, Massachusetts 02210, for the defendant, PEDA, Inc., and deponent.

Nelson, Kinder, Mosseau and Saturley, PC, (by Gerald F. Lucey, Esq.), 45 Milk Street, Fifth Floor, Boston, Massachusetts 02109, for the defendant, Northeastern University.

United States Department of Justice, (by Matthew A. Connelly, Esq.), Torts Branch, Civil Division, P.O. Box 14271, Washington, DC 20044-4271.

Casner and Edwards, LLP, (by Matthew L. Lunenfeld, Esq.), 303 Congress Street, Boston, Massachusetts 02210, for the defendant, Ledgewood Construction.

Also Present: Brian Burns, Esq.
              Northeastern University

INDEX

Deposition of:                          Page
PAUL SCOTT DONAHUE

  Examination by Ms. Hand        5, 140
  Examination by Mr. Connelly    93, 141
  Examination by Mr. Lucey       120

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 3

INDEX (Continued)

Exhibits                                 Page

No. 56  Re-notice of taking deposition.   4

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 4

STIPULATIONS

It was stipulated and agreed by and between counsel for the respective parties that the sealing, filing and certification of the deposition are waived.

It was further stipulated and agreed that all objections, except as to form of question, including motions to strike, shall be reserved until the time of trial.

MS. HAND: We'll mark the re-notice of taking deposition.

(Exhibit No. 56, re-notice of taking deposition, marked.)

PAUL SCOTT DONAHUE, a witness called on behalf of the plaintiffs, first having been satisfactorily identified and duly sworn by the Notary Public, on oath deposes and says as follows:

//
//

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 21

1  David Donahue?
2  A.  David Donahue.
3  Q.  But at some point you had discussions
4  with Ledgewood Construction?
5  A.  Yes.
6  Q.  Who there, do you know?
7  A.  Joe Trainor, I believe his name was.
8  Q.  Can you give me a time frame for when
9  the first communications took place?
10  A.  I couldn't.
11  Q.  Do you know if it was in 2001?
12  A.  Yes.  I couldn't tell you anything
13  more than that.  I mean, I don't remember.
14  Q.  What was the substance of your early
15  communications with Joe Trainor about the
16  Parsons Field project?
17  A.  Discussed the scope of work.  That was
18  about it.
19  Q.  What did you discuss when you were
20  talking about the scope of work?
21  A.  Relocating the existing dugouts.  That
22  was it.
23  Q.  Was this just the work you were being
24  asked to do?

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 22

1  A.  That's correct.
2  Q.  Was Ledgewood discussing subbing some
3  work out to you on that Parsons Field renovation
4  project?
5  A.  I'm not sure I understand.
6  Q.  Was Ledgewood going to hire you to do
7  certain aspects of the work that it had agreed
8  to do overall or be responsible for?
9      MR. LUNENFELD:  Objection.
10  A.  Relocating the dugouts, yes.
11  Q.  Do you know how many dugouts were
12  going to be relocated?
13  A.  Two.
14  Q.  In having these initial conversations
15  with Ledgewood, did you do anything to look into
16  the job?
17  A.  I don't understand.
18  Q.  You had some conversations with Joe
19  Trainor in which the topic came up they wanted
20  you to be involved in the Parsons Field
21  renovation project to move two dugouts; is that
22  right?
23  A.  Yes.
24  Q.  After it was clear to you what the

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 23

1  scope of work you were being asked to do was,
2  did you do anything to check out what the job
3  was going to involve?
4  A.  I met Joe Trainor at the job site.  We
5  looked at it, discussed it.  And that was the
6  extent of it.
7  Q.  When you say you looked at it, what
8  did you look at?
9  A.  The dugouts.
10  Q.  Specifically do you recall what you
11  were looking at?
12  A.  Just what they looked like.
13  Q.  Was there any kind of plan in place
14  for how or where the dugouts were going to be
15  relocated?
16  A.  No, not that I know of.
17  Q.  Your understanding at the time you
18  went to Northeastern with Joe Trainor was just
19  they were going to be moved someplace else on
20  the field?
21  A.  Joe Trainor built a new foundation for
22  the dugouts.  So we knew from point A to point B
23  where they were going.
24  Q.  When you first went to the field, were

MAHANEY REPORTING SERVICES
(617) 542-4207

## Page 24

1  the new foundations already built?
2  A.  No.
3  Q.  Were you shown where they were going
4  to be?
5  A.  Yes.
6  Q.  Did you discuss what the new
7  foundations were going to be like, what the
8  construction of the new foundations would be?
9  A.  Yes.
10  Q.  What was that conversation?
11  A.  They were cement blocks.
12  Q.  Was that what the original foundation
13  for the dugouts was made of?
14  A.  I don't remember.
15  Q.  Do you have any recollection that the
16  original dugouts had a below-grade foundation?
17  A.  I don't remember.
18  Q.  Was there any discussion of whether
19  the new foundations would be below grade or not?
20  A.  They were going to be above grade.
21  Q.  Slab on grade?
22  A.  No, concrete masonry units, CMU
23  blocks.
24  Q.  Were the concrete blocks going to sit

MAHANEY REPORTING SERVICES
(617) 542-4207

**25**

1  on another kind of foundation of some sort?
2  A.  I believe they sat on a concrete slab.
3  Q.  Was there any discussion that you knew
4  of about why the foundation was going to be of a
5  different type than existed originally?
6  A.  No.
7  Q.  What did you do when you were looking
8  at the dugouts when you first went out there?
9  Do you recall specifically what you did?
10  A.  I looked at the framing of the dugout
11  and the locations to where the dugout was going
12  to.
13  Q.  What did you observe about the framing
14  of the dugout?
15  A.  Honestly, I don't remember.
16  Q.  Did you make any notes while you were
17  there?
18  A.  No.
19  Q.  Did you make any notes shortly after
20  the visit to record anything that you had seen
21  or noted during the course of your visit?
22  A.  No.
23  Q.  Am I right you don't recall the date
24  of that visit?

MAHANEY REPORTING SERVICES
(617) 542-4207

**26**

1  A.  No.
2  Q.  The month?
3  A.  I don't have any idea.
4  Q.  After you went on the site visit what
5  was the next thing you did with respect to the
6  Parsons Field project?
7  A.  I wrote up a proposal.
8  Q.  Did you do that by yourself, or did
9  you have input from other people?
10  A.  I did that by myself.
11  Q.  What did the proposal cover?
12  A.  Relocating the dugouts.  I believe
13  that's it.  I don't remember what else I wrote.
14       MR. LUCEY:  Keep your voice up
15  please.
16  Q.  Do you recall whether you had a plan
17  in mind at the time you prepared the proposal of
18  how the relocation was going to take place?
19  A.  Yes.
20  Q.  What in your mind was going to happen?
21  A.  We were going to put a frame above the
22  dugouts, strap down, attach to the existing
23  framing of the dugout, and then have a crane
24  lift it up as a single unit.

MAHANEY REPORTING SERVICES
(617) 542-4207

**27**

1  Q.  What was going to happen from there
2  once it was lifted?
3  A.  Swung over into the new location and
4  placed on top of the foundation.
5  Q.  After it was placed down was part of
6  your job going to be to fasten the dugout
7  structure to the foundation?
8  A.  Yes.
9  Q.  Was there an established method in
10  mind for how that was going to happen?
11  A.  There was an existing - they had
12  existing re-bars sticking out of the foundation.
13  Q.  The new foundation?
14  A.  The new foundation.
15  Q.  So they prepared it with rebar --
16  A.  Sticking out, yeah.  We had to cut
17  that so we could put the dugout down.  It was
18  half-inch rebar, I believe.  And we installed
19  new three-quarter-inch wedge anchor bolts.
20  Q.  Before the day that the dugout was
21  actually moved was there a plan for how the
22  dugout was going to be attached, or was that how
23  you intended to attach the dugout?
24  A.  I did not know how the dugout was

MAHANEY REPORTING SERVICES
(617) 542-4207

**28**

1  going to be attached.
2  Q.  Had there been any discussion about
3  how you were going to incorporate the existing
4  rebar that was in the new foundation in the
5  attachment --
6  A.  I didn't know there was rebar in the
7  foundation until I got out there.
8  Q.  Let me jump back, not to get too far
9  out of order - I'll show you a document that's
10  been marked as Exhibit 30 in another deposition
11  in this case.  And I'll ask you if that is the
12  proposal that you prepared with respect to the
13  Parsons Field project?
14       MR. BRUNO:  While he's reading, I
15  think in your questioning you jumped tracks.  At
16  first you were asking him about before they
17  started moving it, and he started answering when
18  he got there that day to move it.  I think
19  that's where the rebar question comes in.
20  Q.  Thank you.
21  A.  Okay.  Yes, this is my proposal.
22  Q.  Looking at Exhibit 30, it appears you
23  had made some plans for specifically how the
24  dugout moving was going to take place; is that

MAHANEY REPORTING SERVICES
(617) 542-4207

61

1  A. I don't remember.
2  Q. Was there a code requirement for where
3  the anchor bolts should be placed in a structure
4  like the dugout?
5  A. I don't know.
6  Q. Did you have other anchor bolts with
7  you besides the three-quarter-inch by eight-inch
8  anchor bolts at the time you were relocating the
9  dugouts?
10  A. In my truck?
11  Q. With you at Parsons Field.
12  A. Other than the three-quarter-inch?
13  Q. Right.
14  A. I probably had some in my truck.
15  Q. Do you remember if you did or not?
16  A. Oh, I have no idea.
17  Q. How many did you have with you, if you
18  recall, at the time you had to leave and get
19  more?
20  A. I don't know.
21  Q. By the time you came back to Parsons
22  Field, what was going on with that first dugout?
23  A. Well, they had to cut more of the
24  paneling off to get the drill in. And you know,

MAHANEY REPORTING SERVICES
(617) 542-4207

62

1  I didn't hear of any issues so --
2  Q. How much paneling did they ultimately
3  have to cut off?
4  A. I don't know. I don't remember how
5  much it was.
6  Q. Was it more than the six to 12 inches
7  you listed in your proposal?
8  A. Yes.
9  Q. Do you know what the reason was for
10  having to take more?
11  A. To put my hammer drill - the bit on
12  the hammer drill has got to go through the sill
13  and into the concrete, so it's probably a foot.
14  The drill itself was probably a foot and a half
15  so --
16  Q. Is that the tool you would ordinarily
17  use for placement of wedge anchors?
18  A. Right.
19  Q. Was the area in which Mr. Carnivale
20  was working to attach the dugout to the
21  foundation still open when you returned?
22  A. Yes.
23  Q. Had he completed the attachment?
24  A. On some of them he had, yeah.

MAHANEY REPORTING SERVICES
(617) 542-4207

63

1  Q. But not completely?
2  A. No. He was still working.
3  Q. Did you do any inspection of the work
4  he had already done with the wedge anchors?
5  A. Yeah. I noticed that they were -
6  usually if wedge anchors aren't installed
7  correctly, they're usually sticking out too far.
8  And these were - the heads weren't sticking out.
9  They looked like they were installed perfectly.
10  Q. When you say if they're improperly
11  installed, the heads are sticking out, you mean
12  they're higher above the sill --
13  A. Higher, right. Usually it means for
14  some reason you didn't drill deep enough.
15  Q. Were the wedge anchors that Mr.
16  Carnivale put in sunken into the sill wood, or
17  were they just put in flush against it?
18  A. I'm not sure I understand.
19  Q. When Mr. Carnivale was putting the
20  wedge anchors in, were they installed so that -
21  ideally, the top of the wedge anchor would be
22  flush with the top of the sill plane, or would
23  it stick out above the sill?
24  A. Usually it sticks out the height of

MAHANEY REPORTING SERVICES
(617) 542-4207

64

1  the nut.
2  Q. What next happened with respect to
3  that first dugout after you returned from
4  getting more wedge anchors?
5  A. I went over, gave him the wedge
6  anchors, kind of looked around, make sure
7  everything was all right, asked him if
8  everything was all right, and I left.
9  Q. Where did you go - back to your
10  office?
11  A. Probably back to the office.
12  Q. How long had you worked for Mr.
13  Carnivale at the time you were involved in the
14  Parsons Field project?
15  A. I never worked for Tim Carnivale.
16  Q. I'm sorry, worked with.
17  A. Oh, since '99, maybe 2000. I'm not
18  sure. I think he came with me right when I was
19  starting so --
20  Q. What was the next thing that happened?
21  I understand you left, but what was the next
22  thing that happened after your leaving Parsons
23  Field on that day with respect to the dugout?
24  A. They would have continued putting the

MAHANEY REPORTING SERVICES
(617) 542-4207

Page 73

1  at the time that you were asked to provide a
2  proposal on the Parsons Field project had it
3  already been decided the dugouts were going to
4  be moved rather than new dugouts being
5  constructed in the new locations?
6     A.   I don't know.  I don't know when that
7  was determined.
8     Q.   Did you have any part in making a
9  decision about whether they should be moved or
10 reconstructed?
11    A.   No, no.
12    Q.   The dugouts, at least as of the time
13 that the accident at issue here took place in
14 January of 2002, had three wooden columns in the
15 front of them.  Do you recall those being there
16 at the time the dugouts were moved?
17    A.   I remember columns.  I don't remember
18 how many.  I haven't seen them since I was out
19 there five years ago so --
20    Q.   Do you recall whether there were
21 columns in the front of the dugout in its
22 original location?
23    A.   Yes.
24    Q.   Were those same pieces of wood used

MAHANEY REPORTING SERVICES
(617) 542-4207

Page 74

1  for the columns at the new location for the
2  dugout?
3     A.   Yes.
4     Q.   Did the original columns have some way
5  in which they were attached onto the foundation?
6     A.   The original ones?
7     Q.   Yes.
8     A.   I don't remember.
9     Q.   Were they attached onto the foundation
10 in the new location?
11    A.   I don't know.
12    Q.   Should they have been, in your view?
13    A.   I don't know.
14    Q.   Do you know if there's a code
15 provision or other requirement that they be
16 attached?
17    A.   No.
18    Q.   You don't know; is that right?  You
19 don't know versus --
20    A.   Yeah, I don't know.
21    Q.   I told you I'd be finished with wedge
22 anchors.  I lied.  Other than what the Hilti
23 representative or another manufacturer's
24 representative would tell you when you called to

MAHANEY REPORTING SERVICES
(617) 542-4207

Page 75

1  order wedge anchors, did you as of 2001 have
2  knowledge of the criteria that needed to be
3  considered in deciding what size or type of
4  wedge anchor to use or whether to use a wedge
5  anchor at all in a given instance?
6     A.   Yeah, I have a Hilti catalogue.
7     Q.   And the catalogue lists different
8  variables, I take it?
9     A.   Yeah, gives you all that information.
10    Q.   Other than the Hilti catalogue did you
11 have any knowledge about what the different
12 variables to be considered would be?
13    A.   What variables?
14    Q.   Other than what was listed in the
15 catalogue or what a rep told you, did you have
16 any knowledge in 2001 of what things you needed
17 to take into consideration in deciding what
18 given wedge anchor would be appropriate for a
19 given job or which anchor would be involved in a
20 given job?
21         MR. BRUNO:  Those are two
22 questions, whether or which.  So you might want
23 to answer --
24    A.   The question is whether or not I did

MAHANEY REPORTING SERVICES
(617) 542-4207

Page 76

1  any research into the anchor bolt?
2     Q.   I'll ask it again.  It was two
3  questions.  As of 2001 did you have any
4  knowledge besides what wedge anchor
5  manufacturers told you either through a rep or a
6  catalogue about what factors needed to be taken
7  into consideration in deciding whether wedge
8  anchors were an appropriate fastening system to
9  use on a given job?
10    A.   No.
11    Q.   So you didn't know --
12    A.   I don't think I understand the
13 question.
14    Q.   I'm asking you - did you know the
15 different considerations you would have to make
16 in deciding whether wedge anchors were the right
17 fastening system for the job you were going to
18 do, whether wedge anchors were okay to use or
19 whether another fastening system needed to be
20 used for whatever project you happened to be
21 working on?
22    A.   If I have a question on something,
23 whether I can use a wedge anchor, I would ask
24 Paul Donahue from PEDA.  I'd run it by him.

MAHANEY REPORTING SERVICES
(617) 542-4207

93

1 cause of the dugout's failure on January 5th,
2 2002, was?
3     MR. BRUNO: Once again, I'll caution
4 you anything you or I may have talked about,
5 that's not what she's talking about.
6     MR. CONNELLY: I'll object to lack
7 of foundation. Go ahead.
8     A. I don't agree with the fact that
9 you're saying that the dugout failed or anchor
10 system failed. I don't think it failed. I
11 think when they landed the helicopters - who
12 would have ever thought they would land those
13 type of helicopters there. I would have never
14 in a million years have guessed that.
15     MS. HAND: Let's go off the record
16 for a second.
17     (Discussion off the record.)
18     MS. HAND: I don't have any more
19 questions at the moment for you.
20
21 Examination by Mr. Connelly:
22     Q. Mr. Donahue, my name is Matthew
23 Connelly. I'm with the United States Department
24 of Justice, and I represent the United States in

MAHANEY REPORTING SERVICES
(617) 542-4207

94

1 this litigation. Sir, have you ever served in
2 the military of the United States or any other
3 country?
4     A. No, I have not.
5     Q. Have you ever been present at the
6 landing of the CH-47 helicopter?
7     A. I may have been when I was younger.
8     Q. Where would that have been?
9     A. My uncle flies those.
10     Q. Your uncle flies CH-47s?
11     A. Yes, or he used to.
12     Q. What service was that?
13     A. I'm not sure of the military.
14     Q. You don't know if he was Air Force or
15 Army?
16     A. I think he was Army. I'm not sure.
17     Q. What's your uncle's name, for the
18 record?
19     A. Doug Tate.
20     Q. Do you know how much wind or wind
21 force is generated by a CH-47?
22     A. At that time?
23     Q. Do you know how much --
24     A. No.

MAHANEY REPORTING SERVICES
(617) 542-4207

95

1     Q. Do you have any way of calculating how
2 much wind is generated by a CH-47?
3     A. Do I have?
4     Q. Yes, sir, I'm asking you.
5     A. No.
6     Q. The problem with going second,
7 especially after an extremely thorough take-off
8 to a deposition, is you have to jump around. S
9 bear with me please.
10     A. No problem.
11     Q. I need to look at Exhibit 30 if I may.
12 I think you testified earlier that you were
13 present on the field at the time Mr. Carnivale
14 removed the paneling from the first dugout
15 before he was able to get to the bolts to either
16 cut them or undo them; is that correct?
17     A. That's correct.
18     Q. Now, what I'm trying to figure out,
19 sir, is - if I understand correctly, the dugout
20 is a wooden frame structure?
21     A. That's right.
22     Q. And on the inside, the side where the
23 players sit, was Plywood paneling?
24     A. Yeah.

MAHANEY REPORTING SERVICES
(617) 542-4207

96

1     Q. On the outside was clapboard siding?
2     A. Yeah, I believe so.
3     Q. And in between those two was just a
4 typical set of vertical two-by-four framing?
5     A. That's correct.
6     Q. And it was the interior paneling that
7 was being cut to access the fasteners?
8     A. Right.
9     Q. Now, the framing inside that dugout
10 comes down and attaches to a horizontal sill; is
11 that correct?
12     A. Yes.
13     Q. And it's the sill that was actually
14 sitting on top of the concrete foundation that
15 the dugout was originally attached to; is that
16 correct, sir?
17     A. Yes.
18     Q. Now, when Mr. Carnivale removed the
19 bottom section of paneling, did he expose the
20 sill so that you could see it?
21     A. I believe he did.
22     Q. Did you have a chance to see it?
23     A. I'm sure I probably looked at it.
24     Q. Can you tell me how thick the sill

MAHANEY REPORTING SERVICES
(617) 542-4207