# EXHIBIT B

**VOL. I**

PAGES 1-240

EXHIBITS 14-30

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04CV-11413-EFH

FREDERICK BABCOCK, et al,  )
            Plaintiffs,    )
                           )
vs                         )
                           )
UNITED STATES OF AMERICA,  )
et al,                     )
            Defendants.    )

DEPOSITION of PEDA, INC., by its designee, DAVID A. DONAHUE, taken on behalf of the plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Katherine Henry-Sexton, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Esdaile, Barrett and Esdaile, 75 Federal Street, Boston, Massachusetts, on Wednesday, February 22, 2006, commencing at 10:15 a.m.

MAHANEY REPORTING SERVICES
(617) 542-4207

---

APPEARANCES:

   Esdaile, Barrett and Esdaile, (by Kathryn E. Hand, Atty.), 75 Federal Street, Boston, Massachusetts 02110-1904, for the plaintiffs.

   Donovan Hatem, LLP, (by Brian C. Newberry, Esq.), Two Seaport Lane, Boston, Massachusetts 02210, for the defendant, PEDA, Inc., and deponent.

   Nelson, Kinder, Mosseau and Saturley, PC, (by Gerald F. Lucey, Esq.), 45 Milk Street, Fifth Floor, Boston, Massachusetts 02109, for the defendant, Northeastern University.

   United States Department of Justice, (by Matthew A. Connelly, Esq.), Torts Branch, Civil Division, P.O. Box 14271, Washington, DC 20044-4271.

   Masi and Bruno, (by John H. Bruno, Esq.), 124 Long Pond Road, Unit 11, Plymouth, Massachusetts 02360, for the defendant, Split Boulder Construction.

   Casner and Edwards, LLP, (by Christopher P. Maffucci, Esq.), 303 Congress Street, Boston, Massachusetts 02210, for the defendant, Ledgewood Construction.

Also Present: Brian Burns, Esq.
              Northeastern University

INDEX

Deposition of:                              Page
DAVID A. DONAHUE
    Examination by Ms. Hand                 4
    Examination by Mr. Connelly             190

MAHANEY REPORTING SERVICES
(617) 542-4207

---

INDEX (Continued)

Plaintiff
Exhibits                                              Page

No. 14   Re-notice of taking deposition,
         PEDA, Inc.                                   4
No. 15   Letter, 12/27/99.                            48
No. 16   Purchase order, 6/1/01.                      61
No. 17   Drawing, 5/20/01.                            66
No. 18   Invoice, 5/29/01.                            86
No. 19   Invoice, 6/25/01.                            86
No. 20   Invoice, 7/30/01.                            86
No. 21   Cover sheet, set of plans,
         replacement permit set, 9/7/01.              105
No. 21A-21G   Seven plans.                            105
No. 22   Replacement demolition plan,
         5/8/01.                                      105
No. 23   Daily field report, 5/14/01.                 112
No. 24   Daily field report, 5/17/01.                 113
No. 25   Handwritten notes.                           115
No. 26   Police supplemental report,
         1/5/02.                                      138
No. 27   Letter, 9/24/01.                             173

US
No. 28   FEMA illustration, fastener.                 197
No. 29   Diagrams.                                    205
No. 30   Proposal, Split Boulder.                     215

MAHANEY REPORTING SERVICES
(617) 542-4207

---

         MS. HAND:  Mark this before we begin please.

         (Plaintiff Exhibit No. 14, re-notice of taking deposition, PEDA, Inc., marked.)

         DAVID A. DONAHUE, a witness called on behalf of the plaintiffs, first having been satisfactorily identified and duly sworn by the Notary Public, on oath deposes and says as follows:

Examination by Ms. Hand:

    Q.  Mr. Donahue, my name is Kathryn Hand. I introduced myself before the deposition began. I represent the plaintiffs in this lawsuit, and I'll be asking you some questions. Have you ever had your deposition taken before?
    A.  No.
    Q.  There are a couple of ground rules. If you follow them and I follow them, it will make it easier for the reporter to take down your testimony. What will happen after the deposition is over - the reporter will prepare a

MAHANEY REPORTING SERVICES
(617) 542-4207

## 133

1  really anyone else being there.
2  Q. Do you recall whether Mark Coates was
3  there for a particular reason?
4  A. Probably to witness the dugout being
5  picked up. Using a crane it's kind of a big
6  deal to some people.
7  Q. Was it a curiosity thing? Was that
8  your impression, or was it a matter of his
9  supervising for Northeastern?
10      MR. LUCEY: Objection.
11  A. You'd have to ask him. I don't know.
12  Q. What happened after that?
13  A. The crane picked up - they built a
14  structure above the dugouts and re-strapped the
15  dugouts. The crane then picked up the
16  structure, which was a leveling beam that picked
17  up the whole dugout even, swung it over to the
18  new position, went to put it down onto the new
19  foundation wall, and it - the existing
20  reinforcing rods that were to hold down the
21  dugout were in the wrong location.
22      So then we - I forget who actually
23  cut the bolts off. But at that time it's kind
24  of crucial - you don't want to have this dugout

MAHANEY REPORTING SERVICES
(617) 542-4207

## 134

1  up in the air. You couldn't put it down, so it
2  was one of those fast acting things where you
3  came in and they had to cut off the anchor bolts
4  that were cast in. And then they placed the
5  dugout down on top of the new wall.
6      And then they - after the whole
7  crane broke down and the dugout was in its
8  location, then they went back and re-drilled the
9  holes. I'm leaving some stuff out. I'm sure
10  you'll have questions. Then they inserted the
11  wedge anchors.
12  Q. First you started to say a little
13  earlier, I think, that shortly after you arrived
14  someone was involved in unbolting the dugout
15  structure from its original foundation?
16  A. Yeah, I'm sure.
17  Q. Did you see that happening?
18  A. Well, it had to have happened, so I'm
19  assuming that it happened. But I didn't
20  actually - the dugout was turned the wrong way.
21  So when you were looking at it, you saw the back
22  of it. You didn't see the opening part of the
23  dugout. So there was somebody in there doing it
24  because it happened, but I didn't physically see

MAHANEY REPORTING SERVICES
(617) 542-4207

## 135

1  who it was. It could have been Scott or one of
2  his guys. I don't know. Could have been one of
3  Ledgewood's guys helping out. I don't know.
4  Q. You didn't go around the corner to
5  look in and see --
6  A. No, I didn't see. It doesn't concern
7  me. They were just unbolting it. This wasn't a
8  concern at that time.
9  Q. What was the construction of the
10  dugout?
11  A. It was wood construction.
12  Q. Plywood sides?
13  A. It was actually T-111 sides, which is
14  Plywood sides, grooved Plywood. I think it was
15  two by four sills on the bottom. I can't
16  remember the walls in the roof - strike that. I
17  don't know about the sill. I don't know if they
18  were two by six, two by eights or two by fours.
19  I can't remember. But it was a wood framed
20  structure with asphalt shingles on the roof, and
21  I believe it was two columns in the front of it
22  holding up the end of the roof.
23  Q. Were the columns embedded in the
24  ground in some way?

MAHANEY REPORTING SERVICES
(617) 542-4207

## 136

1  A. Yeah, they were cut because I don't
2  know if they were anchored into the concrete or
3  if over years they were rotted, and we cut them
4  just because the wood was rotting. I can't
5  remember which one it was, but it was one of
6  them.
7  Q. Were the columns moved when the dugo
8  was moved, or were they disposed of?
9  A. No. They were moved with the dugout.
10  Q. Were they ultimately replaced, or did
11  they stay in place?
12  A. Stayed in place. Actually, one might
13  have been replaced, and one might have been
14  left.
15  Q. I'm going to show you the Brookline
16  Police Department supplemental report dated
17  January 5 of 2002, and just ask you if you look
18  on page - take your time looking at it - page
19  two in the first paragraph it discusses the
20  author's observation of the construction of the
21  sill. Once you look at it my question will be
22  whether that is consistent with your memory?
23      MR. LUCEY: Do you mean the
24  construction of the sill before the dugout was

MAHANEY REPORTING SERVICES
(617) 542-4207

161

1  I was on the phone with him.
2  Q. Do you know what the position of the
3  anchor bolts once they were placed was?
4  A. As far as what?
5  Q. Do you know where in the sill of
6  the dugout they were placed, how far apart or
7  where --
8  A. I don't recall what the spacing was
9  but - I don't recall what the spacing was.
10  Q. Do you know who did the actual
11  placement?
12  A. I believe it was Scott and another
13  worker, one of his workers.
14  Q. Were you present to see any of the
15  anchor placement?
16  A. I would pop over and see him drilling
17  through the sill, and then I'd walk away and
18  come back and see him banging the anchors down,
19  and then I'd walk away. I wasn't standing over
20  his shoulder the whole time.
21  Q. Did you do any inquiry into how the
22  placement of the wedges should be, wedge
23  anchors?
24  A. As far as what?

MAHANEY REPORTING SERVICES
(617) 542-4207

162

1  Q. Did you know what the code required,
2  for example, as far as spacing of the anchor
3  bolts in a situation with the dugout?
4  A. It's a little bit different when it
5  comes to the dugout because in the code there is
6  no dugout anchor bolt system. You know, knowing
7  the code, they'll say single story house, or it
8  will be different things. But there's no dugout
9  in the code book, so you have to use your best
10  judgment.
11  Q. Were you involved in making the
12  judgment call as to where the wedge anchors
13  should go?
14  A. That was Paul Donahue, and I believe
15  he came up with, I think, a foot on the ends, a
16  foot in from the corners, and then every six
17  feet on center.
18  Q. Is that information that he gave to
19  Scott Donahue through you?
20  A. I believe so. That seems reasonable.
21  Q. What was your contact after you passed
22  by and saw the drilling of the anchor bolts
23  through the sill and then you saw some hammering
24  of the bolts into place - am I correct, was that

MAHANEY REPORTING SERVICES
(617) 542-4207

163

1  your testimony?
2  A. Yeah. You put the bolts in and
3  tighten them up, and there's a sleeve that
4  spreads the anchors. You have to bang them in
5  to get them in; and once you start turning them,
6  the bottom of the wedge anchors expand, and
7  that's what grips the mortar or the concrete.
8  Q. What observations did you make
9  throughout the course of the day regarding the
10  work on the dugout?
11  A. It seemed okay. The bolts weren't
12  sticking up off the sill three inches, so
13  there's only one inch in. It looked like they
14  were all in place, all installed correctly.
15  Q. Did you ask your brother about his
16  feeling on whether there was sufficient
17  embedment for the anchors to hold safely?
18  A. No, I didn't ask him that.
19  Q. Did you discuss it with him at all?
20  A. No. If you have an eight-inch bolt
21  and you have an inch on the top, that's seven
22  inches. The sills say four-and-a-half inches.
23  At that time I thought it was only two. That's
24  still three, four inches remaining, so that's

MAHANEY REPORTING SERVICES
(617) 542-4207

164

1  how much would be embedded into the grout. So
2  it seems logical that, you know, it would
3  suffice.
4  Q. I'm going to ask you to take a look at
5  a series of photographs that were marked earlier
6  as Exhibits 8 through 12. Just take a look at
7  them with an eye toward putting them in
8  chronological order.
9  A. These are my pictures?
10  Q. I think they're Sasaki pictures; but
11  if they're not, please let me know if they are
12  yours.
13  A. Did you want me to do something with
14  the pictures? That shows how bad my memory is.
15  Q. Did you take those photographs?
16  A. No, I didn't.
17  Q. Did you take photographs on the day
18  that the dugout was moved?
19  A. Yes.
20  Q. Do you recall approximately how many?
21  A. Probably three or four maybe. I
22  didn't take many.
23  Q. Were they of the dugout and its
24  foundations?

MAHANEY REPORTING SERVICES
(617) 542-4207

**209**

1  A.  You would have to ask Sasaki that. I
2  didn't file them.
3  Q.  Let me ask you this - can you tell me
4  what is labeled on the front, sir?
5  A.  Permit set. However, it's not stamped
6  by the Town of Brookline, so that could be an
7  old permit set or --
8  Q.  Let me direct your attention to 21B.
9  And if you could tell me, sir, I think it's down
10 the right-hand side of the drawing there's a
11 column, and there appears to be some sort of
12 stamp and a date of 5/9/01. Can you tell me
13 whose stamp that is, sir?
14 A.  John D. Hollywood.
15 Q.  That's who signed it, but whose stamp
16 is it?
17 A.  This here?
18 Q.  Yes.
19 A.  John D. Hollywood, that would be the
20 architect.
21 Q.  So what you're saying is you can't
22 tell whether or not Brookline received this
23 particular set of documents?
24 A.  That is correct, because they would

MAHANEY REPORTING SERVICES
(617) 542-4207

**210**

1  stamp it.
2  Q.  As well, okay. So you can't tell me
3  today whether these were the set of documents
4  that Sasaki used in order to get the permits for
5  the Parsons Field project?
6  A.  That's correct.
7  Q.  And permits were required for the
8  Parsons Field project, to your knowledge?
9  A.  I believe so, yes.
10 Q.  Now, the dugouts originally had a
11 portion that was below grade in their original
12 installation; we've agreed on that?
13 A.  Well, the foundation was grade level,
14 so the structure was above grade.
15 Q.  See if I understand correctly - we're
16 talking about the dugouts before they were
17 relocated?
18 A.  That's correct.
19 Q.  Was this something where there a bench
20 in the dugout or a seat?
21 A.  Yes. There was a bench with a backing
22 that ran the whole length of the back wall.
23 Q.  Was the bottom of that bench at grade
24 or below, the feet of it?

MAHANEY REPORTING SERVICES
(617) 542-4207

**211**

1  A.  There wasn't feet. It was an angle -
2  a bracing, an angle brace, that supports the
3  bottom of the seat.
4  Q.  Would a player leaving the field step
5  down into this dugout or just walk right in?
6  A.  They would have to step down to get
7  into it, and I think it was like three steps
8  down or two steps down.
9  Q.  So the floor of the dugout was below
10 grade?
11 A.  Yes. That's why we had to raise up
12 the foundation to sit on the two blocks to
13 incorporate that height difference.
14 Q.  When you say the foundation, before
15 you were talking about the top of the wall that
16 the wooden superstructure was sitting on?
17 A.  Before when?
18 Q.  When you said the foundation was at
19 grade level, did you mean the top of the
20 concrete wall?
21 A.  The top of the foundation wall might
22 have been a little above grade level because the
23 wood structure wasn't going to be into the dirt,
24 so it would have to be bumped up a little bit.

MAHANEY REPORTING SERVICES
(617) 542-4207

**212**

1  Q.  All right. Now, part of your job was
2  coordinating schedules among the various folks
3  doing work on this project; is that correct?
4  A.  Limited. I was not the general
5  contractor on the job, so the general contractor
6  hired his own subs to do the work. So I didn't
7  have much say in whether they start or stop. I
8  just tracked the progression of work being
9  completed.
10 Q.  Okay.
11 A.  He had his own schedule.
12 Q.  Whether or not the new dugout was
13 going to have its floor below grade would impact
14 how much time it was going to take to prepare
15 the foundation for that dugout, wouldn't it?
16 A.  I would - yeah, that's fair, yeah.
17 Q.  Obviously, you're going to have to
18 excavate some dirt to make something below
19 grade?
20 A.  Absolutely.
21 Q.  How did you find out that the new
22 dugout was not going to be below grade?
23 A.  I don't recall. I don't know. I
24 don't remember how or when.

MAHANEY REPORTING SERVICES
(617) 542-4207

213

Q. How did you find out that the wooden portion of the dugout would be re-used?

A. I don't remember how I knew - must have been discussed in a meeting, but I don't know, you know, when or how. There was no documentation on doing it that I'm aware of. I think there was just talk about can we relocate it and, you know, it wasn't --

Q. Let me just follow this because I realize people need to get on the road, but there was a point in time, sir, wasn't there, when I think you testified that Mr. Trainor for Ledgewood had approached you and asked if you knew anybody who could do a rigging or shoring job?

A. That's correct.

Q. And you suggested that your brother's company was one possibility?

A. That's correct.

Q. Do you remember at what point in time that was, what month?

A. It was around the same time that the dugout got moved, probably a week before, so whatever that was. I'm not quite sure. That

MAHANEY REPORTING SERVICES
(617) 542-4207

214

was between them.

Q. I'll show you a document that we'll mark as Exhibit 30. Would you agree with me, sir, that Exhibit 30 represents a proposal by Split Boulder to relocate the dugouts?

A. Yes.

Q. Just to clarify, let me ask this, sir - when did you begin working on the Parsons Field project? What was your first day actually on the job while some sort of construction was underway?

A. Probably from the beginning.

Q. Can you give me an idea of what month that was?

A. I don't remember when the date was that it was beginning. I don't know - May. Is that about right?

Q. Okay. Well, at the time you began the job did you have any understanding of whether or not the dugouts were going to be re-used?

A. No. It wasn't even entered into it. We were too busy doing other things at that time.

MR. CONNELLY: Let's mark that.

MAHANEY REPORTING SERVICES
(617) 542-4207

215

(US Exhibit No. 30, proposal, Split
  Boulder, marked.)

Q. When you started work, sir, was Ledgewood already working on the job?

A. I'm sure they had started preparation as far as getting permits, filing the right paperwork.

Q. On your first day on site were they on site?

A. Possibly. They might have been doing some site work as far as, you know, shooting coordinates and so forth.

MR. CONNELLY: I could open up a whole other line, or we could pause at the moment.

MR. MAFFUCCI: I think it's a good point to stop.

MR. NEWBERRY: Depositions aren't limited to still seven hours, and I'm not going to be a stickler because there's a lot of parties here. It's ludicrous sometimes, but I don't want him to come back and subject him to three hours of questioning by everybody. Could I just ask that everyone streamline their

MAHANEY REPORTING SERVICES
(617) 542-4207

216

questioning? I think we'd all appreciate that.

MR. MAFFUCCI: We all want to do this as quickly as possible.

(Whereupon, the deposition was
 suspended at 5:00 p.m.)

MAHANEY REPORTING SERVICES
(617) 542-4207