# EXHIBIT K

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **FREDERICK BABCOCK, et al** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:04-CV-11413 EFH** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ──────────────────────── | ) | |

## DEFENDANT UNITED STATES OF AMERICA'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES TO BE ANSWERED BY THE UNITED STATES OF AMERICA

Defendant United States of America responds to the Plaintiffs' Interrogatories To Be Answered by the United States of America by providing its answers and raising its general and specific objections. Because discovery is continuing, the United States reserves the right to supplement its responses, if necessary.

### General Objections

The following general objections apply to all interrogatories individually.

1.      The United States objects to each interrogatory to the extent that it seeks discovery of sensitive national security information regarding the procedures and methods for protecting the President of the United States. Disclosure of such

information, even to a limited extent, endangers the safety of the President and places national security at risk.

2.     The United States objects to each interrogatory to the extent that it seeks disclosure of information protected by the law enforcement privilege.

3.     The United States Objects to each interrogatory to the extent that it seeks discovery of information that is not relevant to the limited scope of the allegations contained in the Plaintiffs' Complaint.

**Answers to Interrogatories**

**Interrogatory No. 1**.     Describe in as much detail as possible the process by which the Parsons Field site was chosen for the January 2002 Presidential helicopter landing and for the landing drill that took place on January 5, 2002.  In answering, please identify each individual, agency, and/or entity who or that participated in the process, along with a description of the role played by each in the process.

**Answer:**     The Secret Service, Marine Helicopter Squadron One, and the White House Advance Office, among other entities,  participate in the process of selecting a landing site for a presidential visit.   Representatives of each of these agencies inspect potential sites in order to determine whether that particular site meets their agency's criteria.  The final selection of a landing site is generally the result of a cooperative decision based on the concurrence of all three agencies

2

regarding the suitability of the site. However, the final authority for making a selection among acceptable landing sites resides with the White House.

The White House Advance Office first identified Parsons Field in December 2001 as one of three potential landing sites for the January 8, 2002 visit. Parsons Field was considered a favorable site because, among other reasons, of its close proximity to the President's ultimate destination, the Boston Latin School. The geographic location ensured both a shorter motorcade route and a significant reduction of any adverse impact upon rush-hour traffic in the Boston area. (Information provided by the White House Advance Office.)

After viewing the Parsons Field site, Special Agent (SA) Kenneth Jenkins voiced concerns to the White House Advance team leader regarding several security issues. Nevertheless, SA Jenkins agreed that the Secret Service could secure the Parsons Field site. (Information provided by SA Jenkins.)

HMX-1 White House Liaison Officers, Major Clay Stackhouse and CWO5 George Seagle, inspected the Parsons Field site on January 4, 2002, along with Thomas J. Keady, Jr., Vice President of Northeastern University, and other Northeastern representatives. During that walk-through, Major Stackhouse and Chief Warrant Officer Seagle expressed concerns regarding the impact of the rotorwash on the field, especially on the newly-installed astroturf covering the field. The Northeastern representatives were confident that the field would not be

3

damaged by the helicopters. Although Major Stackhouse had expressed a preference for another potential landing site that was larger, the Marine liaison officers concluded that the landing could be carried out safely at the Parsons Field site. Following the walk-through, a rehearsal landing was scheduled for the evening of January 5, 2002. (Information provided by Major Stackhouse and CWO5 Seagle.)

**Interrogatory No. 2**.       If the United States was given assurances by any individual or entity concerning the safety of the dugout, the soundness of the dugout's design or construction, or the ability of the dugout to withstand the conditions likely to be caused by the helicopter landings planned for January 2002 at Parsons Field, identify the individual or agency making the assurances and the individual or agency to whom the assurances were made, specify what assurances were given, and indicate when each such assurance was made.

**Answer:**     SA Kerry O'Grady,  the landing zone agent for the President's visit on January 8, 2002, believes that the HMX-1 advance team met with representatives from Northeastern University on a variety of issues at Parsons Field, but she does not recall details of conversations regarding the safety and soundness of the dugout. SA O'Grady believes that a question may have been asked about the dugout at one of the walk-throughs of Parsons Field, and believes that the response was that the dugout was anchored two feet into the ground.

4

However, she does not recall when this conversation took place and who asked/responded to the inquiry. Meetings regarding Parsons Field as a landing zone were held between January 2-5, 2002. (Information provided by SA O'Grady).

Ernest Silva, a member of the White House Advance team, attended the January 4, 2002, walk-through at Parsons Field along with the HMX-1 White House Liaison Officers. Mr. Silva recalls the Marine officers pointing out several items that would need to be secured or removed from the landing site because of the effect of the helicopters' rotorwash. Mr. Silva himself asked a representative of Northeastern University whether the dugouts would be affected by the rotorwash. Mr. Silva was told not to worry because the dugouts were firmly bolted to their foundations and could withstand a hurricane. (Information provided by Mr. Silva.)

**Interrogatory No. 3.**    Describe in as much detail as possible any and all communications between the United States of America on the one hand, and Northeastern University or any Massachusetts state or municipal authority on the other hand, concerning the helicopter landings planned for January 5 and 8, 2002 at Parsons Field. Please include in your answer, without limitation, a description of any communications about the appropriateness of Parsons Field as a landing site for the helicopters, the need for inspection and/or changes to Parsons Field and the

5

structures on it in anticipation of the landings, and/or safety precautions to be taken in anticipation of the landings.

**Answer:**     Objection.  Interrogatory No. 3 is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving either these specific objections, or the general objections, and subject to them, the United States provides the following answer:

SA O'Grady recalls that she and her Boston counterpart, SA Vincent Stofa, made contact with a Brookline Police Department representative regarding securing a perimeter and keeping the public away from the landing zone, and had planned on meeting further to discuss posting of officers and special agents for the January 8, 2002 visit.  SA O'Grady also recalls some preliminary discussion between the Secret Service and a representative from Northeastern University about opening or moving fencing in order to allow the motorcade cars to pull onto the field.  SA O'Grady does not recall the names of these representatives. (Information provided by SA O'Grady.)

Additionally, please see the answers to the previous Interrogatories.

**Interrogatory No. 4:**     Identify the individuals, agencies, or entities involved in the January 5, 2002 helicopter landing drill at issue in this litigation:

a.     the individual, agency, or entity responsible for supervising the landing drill;

b.  the pilot and crew of each helicopter or other aircraft involved in the landing drill;

c.  the individual, agency, or entity responsible for each and every investigation conducted by the United States of America into the January 5, 2002 incident at issue in this litigation.

**Answer:**

Subpart a:

As the HMX-1 White House Liaison Officer present at the site, Chief Warrant Officer Seagle was responsible for communicating with the helicopters and for providing guidance on the timing of the landings. The Secret Service was on site for the landing drill to observe for protection purposes how the helicopters would fit on the field, and how close the Secret Service could pull in vehicles for pick up of individuals who were to land. In addition, several White House staff members and Northeastern University representatives were present as well. Only CWO5 Seagle's duties directly related to the operation of the helicopters. (Information provided by CW05 Seagle, SA O'Grady, and Mr. Silva.)

7

Subpart b:

Crew of the first Ch-47 to enter the landing zone

MAJ. Patrick Flaherty (then CPT) - pilot
CW4 Cooper Hastings - pilot in command
SGT James Greenwalt
SPC Michael Phillips
Maj. Joseph G. Kringler, USMC (jump seat pilot)

Crews of the remaining CH-47 aircraft
(not all of these aircraft attempted to land at Parsons Field)

MAJ Thomas Boland
CW5 Kenneth Roach
SSG Edward Dettore
SPC Michael Klattenburg

CW4 John Kozub
CW2 Kenneth Duenzl
SSG Roland Girard
SPC Brian Perez

1LT Robert Detrick
CW4 Michael Vollero
SGT William Brown
SSG Paul Albert

Maj. Andrew N. Gappy, USMC
Jump seat pilot on the second CH-47 to enter the landing zone

LtCol. Edward N. Spicknall, USMC (then Maj.)
Pilot of Marine One on January 5, 2002

(Information provided by HMX-1 and Connecticut Army National Guard.)

Secret Service Special Agent Tyler McQuiston was on board one of the

helicopters involved in the landing drill as he was getting a ride to another

8

destination, although he was not otherwise a participant in preparations for the rehearsal or the rehearsal itself. SA McQuiston does not know the names of the other individuals on board that helicopter, nor did he witness the incident regarding the dugout. (Information provided by SA McQuiston.)

Subpart c:

The only investigation of this accident was conducted under the supervision of an attorney and in anticipation of litigation. As such the investigation constitutes attorney work-product information and is not subject to discovery.

**Interrogatory No. 5**     Identify each and every rule and regulation, whether military or non-military, governing planning, supervising, and/or executing the following:

    a.    Presidential helicopter landings;

    b.    Landing drills for military helicopters, including without limitation Presidential helicopters; and

    c.    Investigations into accidents involving military helicopters and personal injury to civilians.

**Answer:**     Objection. Interrogatory No. 5 is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving either these specific objections or the general objections and subject to them, the United States provides the following answer:

9

.        Subpart a:

   (1)     HMX-1 Standard Operating Procedure for Flight Operations of

           23 February 2000;

   (2)     Marine One Advance Officer Guide Book of December 2000; and

   (3)     White House Military Office Standard Operating Procedures for

           White House Helicopter Missions, 8 January 1998.

Subpart b:

   (1)     HMX-1 Standard Operating Procedure for Flight Operations of

           23 February 2000;

   (2)     Marine One Advance Officer Guide Book of December 2000; and

   (3)     White House Military Office Standard Operating Procedures for

           White House Helicopter Missions, 8 January 1998.

 Subpart c:

   (1)     JAG INSTRUCTION 5800.7c, Manual of the Judge Advocate

           General, paragraph 0242, 3 OCTOBER 1990 (1990 version was in

           use during the time of the incident);

   (2)     OPNAVINST 3750.6R, Naval Aviation Safety Program, 1 March

           2001;

   (3)     NAVAIR 00-80T-116-1, 2, 3, AND 4, Technical Manual Safety

           Investigation Volumes 1,2, 3, and 4,  Mishap Investigation;

(4)    MARINE CORPS ORDER 3750.1A, Aviation Safety and

Standardization Programs, 12 June 1996; and

(5)    SQUADRON ORDER P3750.3K, Detailed Premishap Plan, 21

August 1996.

**Interrogatory No. 6:**    If, before January 5, 2002, the United States made any

suggestions to anyone about ensuring the safety of bystanders in the area of the

January 5, 2002 landing drill or planned Presidential helicopter landing on January

8, 2002, or if it gave any instructions or warnings on that subject to anyone,

describe those suggestions, instructions, or warnings in as much detail as possible,

identifying the individual or entity to whom they were given, and the date on

which they were given.

**Answer:**    Objection.  Interrogatory No. 6 is vague, overbroad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible

evidence.  Without waiving either these specific objections, or the general

objections, and subject to them, the United States provides the following answer:

At the January 5, 2002 rehearsal, SA O'Grady observed a number of

bystanders, including children, on Parsons Field and in the surrounding area.  SA

O'Grady asked all the public viewers to get into their cars.  Her purpose for this

request was that she wanted to simulate, as much as possible, the President's visit

on January 8, 2002 planned for Parsons Field, and no public would be allowed at

11

the site on the day of the actual visit. SA O'Grady mentioned to the public

viewers that there could be some rotor wash from the helicopters. (Information

provided by SA O'Grady).

Prior to the rehearsal on January 5, 2002, upon returning to Parsons Field,

Chief Warrant Officer Seagle found that press risers had been placed on the field

between home plate and the pitcher's mound. CWO5 Seagle notified

Major Christopher Lovejoy (the WHLO in Portsmouth, NH) of the obstructions

and asked that the CH-47D pilots adjust their original landing points within the

landing zone accordingly. In a further attempt to alleviate his concerns, CWO5

Seagle fastened the objects together in order to reduce the likelihood of the objects

becoming airborne during the helicopter landing. Prior to the aircraft arriving in

the zone, CWO5 Seagle directed all unnecessary personnel to remain in their

vehicles while the helicopters were in the immediate vicinity. (Information

provided by CWO5 Seagle.)

Mr. Silva of the White House Advance team also attended the rehearsal.

Having attended several presidential landings, Mr. Silva had experienced the

effects of rotor wash from large helicopters first hand. Mr. Silva noticed a group

of firefighters standing behind the cyclone fence next to the first base dugout. Mr.

Silva advised the firefighters to move further back away from the field in order to

avoid the rotorwash. The firefighters informed Mr. Silva that they needed to be

next to the field in order to respond to an emergency. (Information provided by Mr. Silva.)

**Interrogatory No. 7:** Describe in as much detail as possible any and all disciplinary proceedings undertaken against any agent, servant, or employee of the United States as a result of the incident at Parsons Field on January 5, 2002.

**Answer:** There were no disciplinary proceedings undertaken as a result of the incident at Parsons Field on January 5, 2002.

Dated: March 15, 2005

                                Respectfully submitted,

                                PETER D. KEISLER
                                Assistant Attorney General

                                MICHAEL J. SULLIVAN
                                United States Attorney

13

BARBARA HEALY SMITH
Assistant United States Attorney

MATTHEW A. CONNELLY
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 14271
Washington, DC  20044-4271
(202) 616-4040
(202) 616-4159 (fax)

Attorneys for the
United States of America

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that copies of the Answer of Defendant United
States of America to the Plaintiffs' Interrogatories to be answered by the United
States were sent via first class mail, postage pre-paid, this 3rd day of March, 2005,
addressed to the following counsel of record:

Michael E. Mone, Esq.
Kathryn E. Hand, Esq.
Esdaile, Barrett & Esdaile
75 Federal Street
Boston, MA  02110

John H. Bruno, Esq.
Masi & Bruno
124 Long Pond Road, Unit 11
Plymouth, MA  02360

Gerald F. Lucey, Esq.
Nelson, Kinder, Mosseau & Saturley, PC
45 Milk Street, 5th Floor
Boston, MA  02109

Terrence J. Hamilton, Esq.
Christopher Maffucci, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210

David J. Hatem, Esq.
Warren D. Hutchinson, Esq.
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210

MATTHEW A. CONNELLY

14