# ATTACHMENT A

1

<u>VOL. I</u>

<u>PAGES 1-212</u>

<u>EXHIBITS 1-13</u>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04CV-11413-EFH

FREDERICK BABCOCK, et al,   )
          Plaintiffs,       )
                            )
              vs            )
                            )
UNITED STATES OF AMERICA,   )
et al,                      )
          Defendants.       )

    DEPOSITION of JOHN MALONE, taken on behalf of the plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Katherine Henry-Sexton, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Esdaile, Barrett and Esdaile, 75 Federal Street, Boston, Massachusetts, on Friday, February 17, 2006, commencing at 10:10 a.m.

MAHANEY REPORTING SERVICES
(617) 542-4207

APPEARANCES:

　　　　Esdaile, Barrett and Esdaile, (by Kathryn E. Hand, Atty.), 75 Federal Street, Boston, Massachusetts 02110-1904, for the plaintiffs.

　　　　Nelson, Kinder, Mosseau and Saturley, PC, (by Gerald F. Lucey, Esq.), 45 Milk Street, Fifth Floor, Boston, Massachusetts 02109, for the defendant, Northeastern University and deponent.

　　　　United States Department of Justice, (by Matthew A. Connelly, Esq.), Torts Branch, Civil Division, P.O. Box 14271, Washington, DC 20044-4271.

　　　　Masi and Bruno, (by John H. Bruno, Esq.), 124 Long Pond Road, Unit 11, Plymouth, Massachusetts 02360, for the defendant, Split Boulder Construction.

　　　　Casner and Edwards, LLP, (by Christopher P. Maffucci, Esq.), 303 Congress Street, Boston, Massachusetts 02210, for the defendant, Ledgewood Construction.

　　　　Donovan Hatem, LLP, (by Brian C. Newberry, Esq.), Two Seaport Lane, Boston, Massachusetts 02210, for the defendant, PEDA, Inc.

Also Present:　Brian Burns, Esq.
　　　　　　　　Northeastern University

I N D E X

Deposition of:　　　　　　　　　　　　　　　　Page

JOHN MALONE

　　Examination by Ms. Hand　　　　　　　　　4
　　Examination by Mr. Bruno　　　　　　　　135
　　Examination by Mr. Maffucci　　　　　　164

I N D E X (Continued)

Plaintiff
Exhibits                                              Page

No. 1    Web site printout.                            35

No. 2    E-mail, 2/6/01.                               53

No. 3    Memo, 3/27/01.                                53

No. 4    Contract, Southwest.                          65

No. 5    Letter, 4/30/01.                              69

No. 6    Letter, 5/11/01.                              69

No. 7    Letter, 4/9/01.                               70

No. 8-
    12   Five photographs.                             134

SB
No. 13   Daily report, 5/14/01.                        161

```
 1              JOHN MALONE, a witness called on
 2   behalf of the plaintiffs, first having been
 3   satisfactorily identified and duly sworn by the
 4   Notary Public, on oath deposes and says as
 5   follows:
 6
 7   Examination by Ms. Hand:
 8       Q.    Mr. Malone, I introduced myself
 9   before.  My name is Kathryn Hand, and I
10   represent the plaintiffs in this lawsuit.  I'll
11   ask you some questions here today.  Have you had
12   your deposition taken before?
13       A.    No, I have not.
14       Q.    Let me give you a few ground rules.
15   This is a question and answer format.  I'll ask
16   you some questions and ask you to give me your
17   answers; and in doing so, I'd ask that you make
18   sure that you understand the question I'm asking
19   you.  If you don't, please let me know, and I'll
20   be happy to clarify the question.
21              In answering the questions, it's
22   easier for the reporter if you would let me
23   finish asking my question before you begin
24   giving your answer, and I will try not to step
```

```
 1   been anything unusual about the moving of the
 2   dugout building?
 3       A.   No.
 4       Q.   Did you have any conversation with
 5   PEDA specifically about the dugouts moving?
 6       A.   No.
 7       Q.   Did you have any conversation with any
 8   other contractor on the job about the dugouts
 9   moving?
10       A.   No.
11       Q.   Did you know at that time that the
12   dugouts had been intended to be secured by
13   cast-in-place rods that were set into the block
14   foundation?
15       A.   No.
16       Q.   Did you hear anything about any
17   mis-measurement problem with the rods as opposed
18   to the holes they were supposed to line up with
19   in the sill of the dugout structure?
20            MR. CONNELLY:   Objection, vague as
21   to time.
22       Q.   In the late June, early July period?
23       A.   No.
24       Q.   Did you at some later time become
```

1   aware of the fact that there was a problem with
2   the original plan for attaching the dugout to
3   its new foundation?
4           MR. BRUNO:   I object.
5       Q.   Let me ask it this way - did you
6   become aware at some time after late June, early
7   July of 2001 that there had been a change in the
8   means of fastening the dugout to its new
9   foundation?
10      A.   The night of the accident.
11      Q.   Okay.
12      A.   The night of the accident when the
13  Brookline Police were doing an inspection of the
14  dugout, they pointed out to me that a bolt
15  looked like it had been cut as opposed to a bolt
16  that looked like it had been snapped.  That's my
17  knowledge of the questions you're asking me.  I
18  didn't - I still don't know that to be - I still
19  don't know for sure that there was a change in
20  the construction method.  I do know that the
21  night of the accident that a Brookline police
22  officer said, "Jack, that bolt looks like it was
23  cut."
24      Q.   And I apologize this is beating a dead

   1    horse, I know, but at the time that the dugout

   2    was moved in June of 2001 or in that general

   3    time frame, you didn't speak with anyone or

   4    receive any written --

   5        A.    No.

   6        Q.    Just let me finish the question -

   7    speak with anyone or receive any written notice

   8    of any change to the means by which the dugout

   9    was fastened to its foundation as opposed to the

  10    way it had been intended to be fastened?

  11        A.    No, I did not.

  12        Q.    The first thing you knew about

  13    anything about the means the way the dugout was

  14    to be fastened to the foundation was the night

  15    January 5, 2002?

  16        A.    I still don't know the means.  You

  17    initially asked did I know anything.  I knew

  18    that there was a bolt that was cut, but I didn't

  19    know anything about the means or the method even

  20    at that time.

  21        Q.    How did you come to be at Parsons

  22    Field on the evening of the accident?

  23        A.    Tom Keady, who is our vice president,

  24    called and asked if I'd come to Parsons Field.

```
 1    a landing area for helicopters?
 2        A.    No.
 3        Q.    Do you know whether anyone at
 4    Northeastern was asked to give that type of
 5    assurance or did give that type of assurance?
 6        A.    I do not.
 7        Q.    Did you participate in any
 8    walk-throughs or inspections or other
 9    preparation for the January 5, 2002, landing
10    drills other than what you've already discussed?
11        A.    I don't know if we've discussed that.
12        Q.    You told me you were present before
13    the helicopters came; you had been asked to be
14    present on January 5?
15        A.    That's a different question.
16        Q.    I'm including that as a preparation.
17    You already told us something.  Were you present
18    on any walk-throughs or inspections in
19    anticipation of the January 5th, 2002, landing?
20              MR. LUCEY:  Objection.
21        A.    Yes.
22        Q.    What did you do in that regard?
23        A.    Before January 5th Tom Keady had
24    called me to meet him at Parsons Field, and at
```

```
 1    Parsons Field was a Government official he
 2    introduced me to.
 3         Q.   Do you recall who it was?
 4         A.   I do not.
 5         Q.   What happened?
 6         A.   Tom briefed me on the side saying that
 7    the President wanted to come, the President's
 8    office wanted to come and use Parsons Field as a
 9    possible landing site.  He said, "The gentleman
10    we're going to meet is going to ask some
11    questions about the field."  So we walked out
12    onto the playing field.
13         Q.   Can you tell me the conversation you
14    had in that conversation in as much detail as
15    you can?
16         A.   The conversation was about the -
17    focused around the surface, artificial surface,
18    and what would happen to it if a helicopter
19    landed on it.
20         Q.   What did he say and what did you say?
21         A.   My conversation was about that.  It
22    was January and the rubberized pelts were
23    frozen; and that the surface, artificial
24    surface, was a strong one.  It was basically
```

1    just a rug, and that I was not concerned about
2    something landing on it.
3        Q.    Were you concerned that having
4    helicopters land on it would invalidate the
5    warranty for the turf?
6        A.    I hadn't thought about that.
7        Q.    You did get specific instructions from
8    Southwest about what could or couldn't be done
9    on the turf - for example, snow clearance and
10   what kind of vehicles could be driven on it; is
11   that right?
12       A.    There were things that would
13   invalidate, but snowplowing wasn't one of them.
14       Q.    But landing on a field with a
15   helicopter was not on your mind as a warranty
16   concern at the time you had this meeting?
17       A.    No.  The conversation was about if it
18   dented the field a little bit, how it would be
19   repaired.
20       Q.    Was there any other conversation
21   during that meeting that you can remember?
22       A.    There was conversation about a car
23   driving on the surface.
24       Q.    Do you remember the specifics of it?

1   A.   It was, again, about what would happen
2   if a car drove on the surface.
3   Q.   Any other discussion in the course of
4   that --
5   A.   No, those are the two main --
6   Q.   Did you at that time do any visual
7   inspection of the field or any discussion with
8   anyone about the safety, aside from what it
9   might do to the field, but the safety of having
10  a helicopter land on that area?
11  A.   No.
12  Q.   Did you participate in any other walk-
13  throughs or inspections other than the one you
14  described?
15  A.   No.
16       MR. LUCEY:   Objection.
17  Q.   In anticipation of the January 5th
18  landing?
19  A.   Can you repeat the question?
20  Q.   Did you participate in any other walk-
21  throughs or inspections or site visits in
22  anticipation of the January 5th, 2002,
23  helicopter landing other than what you've just
24  described?